J-S15041-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| IN THE INTEREST OF: L.G. | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: R.G., SR., NATURAL | : | |
| FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1731 WDA 2019 |

Appeal from the Order Entered October 22, 2019
In the Court of Common Pleas of Indiana County Orphans' Court at
No(s): 32-19-0130

| IN THE INTEREST OF: R.G., JR. | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: R.G., SR., NATURAL | : | |
| FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1732 WDA 2019 |

Appeal from the Order Entered October 22, 2019
In the Court of Common Pleas of Indiana County Orphans' Court at
No(s): 32-19-0131

BEFORE:   BENDER, P.J.E., OLSON, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:                    **FILED APRIL 3, 2020**

R.G., Sr., ("Father") appeals from the Orders entered on October 22, 2019, which granted the petition of Indiana County Children and Youth Services (the "Agency"), and involuntarily terminated Father's parental rights

_____

[*] Former Justice specially assigned to the Superior Court.

to his biological twin children: R.G., Jr., and L.G. (both born in July of 2017) (collectively "the children").[1]  Father's court-appointed counsel has filed with this Court a motion for leave to withdraw as counsel and a brief pursuant to ***Anders v. California***, 87 S.Ct. 1936 (1967), ***Commonwealth v. Santiago***, 600 Pa. 159, 978 A.2d 349 (2009), and ***In re V.E.***, 611 A.2d 1267, 1275 (Pa.Super. 1992) (extending ***Anders*** briefing criteria to appeals by indigent parents represented by court-appointed counsel in involuntary termination matters).  We grant counsel's motion to withdraw and affirm.

The Orphans' Court has thoroughly set forth the relevant facts and procedural history as follows:

> On August 25, 2017, less than one month after the [children were] born, a Voluntary Placement Agreement was signed, and the [children]…were placed in the LifeSpan licensed foster home of [L.S.] and [C.S.].  On September 21, 2017, an Adjudication and Disposition Hearing was held before [the Orphans'] Court; the minor children were adjudicated as dependent children, and were ordered to remain in the…foster home.  The [Orphans'] Court held Permanency Review Hearings on January 11, 2018, April 5, 2018, June 21, 2018, November 29, 2018, April 11, 2019, and July 24, 2019.  The [children] have remained in the same foster care placement from their initial placement to the present.
>
> [The Agency] filed a Petition for Involuntary Termination of Parental Rights on April 17, 2019.  Through the Petition, the Agency sought to terminate the parental rights of Father. The Agency alleges that…23 Pa.C.S.A. § 2511(a)[(1), (2), (5), and (8), as well as (b)] establish the basis for terminating the parental rights of Father[.]

---

[1] The children's biological Mother executed a consent to adoption on March 4, 2019, and a decree of termination on April 11, 2019.  Thus, Mother's parental rights have been terminated; however, Mother is not a party to the instant appeal.

***

A hearing on the Agency's Petition was held on July 24, 2019. The [Orphans'] Court heard expert testimony from Dr. Carolyn Menta, a clinical psychologist. Dr. Menta authored a Bonding Assessment that was marked and admitted into evidence as Agency Exhibit 1. The [Orphans'] Court also heard testimony from Rachel Pommer, the Agency caseworker assigned to this matter, Renee Pritchard, a social service aide, and Father.

At the hearing, the Agency was represented by William Carmella, Esquire, Father was represented by Katrina Kayden, Esquire, and [the children were represented by Joelyssa Johnson, Esquire, guardian *ad litem*].[2]

Rachel Pommer, the Agency caseworker assigned to this matter, presented the following testimony at the hearing held on July 24, 2019:

The Agency received a phone call from a representative of the hospital where the [children were] born immediately following [their] birth[.] The report indicated that Mother and Father had a history of substance abuse, Mother was living in a garage with no water and no electric, and Father's contact with the children was limited because he had an active warrant for his arrest. The Agency responded, and a plan was developed requiring Mother and the children to reside with a paternal aunt.

[R.G., Jr.,] was discharged on July 31, 2017, and his twin sister, [L.G.], was discharged on August 7, 2017. On August 9, 2017, a General Protective Services referral was made to the Agency because a six-year-old child left the residence of the

_____

[2] During the termination hearing on July 24, 2019, the Orphans' Court noted that, due to the children's young age (they were not yet two years old at the time of the hearing), there was no conflict between the children's legal and best interests, as well as no conflict in each other's interests. N.T., 7/24/19, at 104. Accordingly, the Orphans' Court determined it was unnecessary to appoint separate counsel to represent the children's legal interests, and consequently, Attorney Johnson served in the dual role as the children's guardian *ad litem* and legal counsel. ***Id. See In re T.S.***, 648 Pa. 236, 192 A.3d 1080, 1089-93 (2018) (reaffirming the ability of an attorney-guardian *ad litem* to serve a dual role and represent child's non-conflicting best interests and legal interests). The Agency's attorney, Father's attorney, and Attorney Johnson all agreed with the Orphans' Court's assessment in this regard. N.T., 7/24/19, at 104.

- 3 -

paternal aunt unaccompanied. A home visit was conducted on August 25, 2017, and the Agency caseworker was informed the Mother left the paternal aunt's home with the children on August 22, 2017. Then as stated above, a Voluntary Placement Agreement was signed, and the [children were] placed in [the] LifeSpan licensed foster home of [L.S.] and [C.S.].

Father first contacted the Agency on October 26, 2017. He had left the residence in early August because of the active bench warrant, and he was incarcerated on the bench warrant on October 17, 2017. The Agency next heard from Father in December of 2017; he made a request to have contact with the children at that time.

[Father] was incarcerated at the Westmoreland County Prison ["the WCP"], [and], therefore, the Agency contacted representatives of the WCP to make arrangements for contact visits. The Agency was informed that a Court Order was required, [and], therefore, [the Orphans' Court] entered an Order of Court dated January 3, 2018, directing the contact visits. The Agency made efforts to arrange the contact visits; however, the Agency experienced many problems with the WCP, including, but not limited to, the WCP requiring a written contract with the Agency and requiring background checks on any Agency employee attending a visit.

These problems resulted in further Court involvement, and finally, on August 21, 2018, the first contact visit was held.[3] Father attempted to hold the children, but they cried. The WCP counselor became upset about the crying and terminated the visit. The next contact visit was not held until October 4, 2018. A total of seven contact visits were held at the WCP during Father's incarceration at that facility. Father was moved to SCI Greene in March of 2019, and as of the date of the hearing [on] the Agency's Petition, two contact visits had been held at the state facility.

Finally, Rachel Pommer testified that she has visited the children in the foster home several times. In her opinion, there is a very positive relationship and bond between the minor [children]

_____

[3] As the Orphans' Court noted, the Agency arranged for several video visits to be held between the children and Father at the WCP. However, given the young age of the children, the video visits were largely unsuccessful. The first video visit was on May 2, 2018.

- 4 -

and the foster parents. She observed that the minor [children are] "very clingy" with the foster parents.

Dr. Carolyn Menta, a clinical psychologist, was offered and accepted as an expert in the field of clinical psychology. She then provided testimony regarding her clinical interview of the foster parents and her observations of the foster parents with the children. She testified that [L.S.] and [C.S.] are very attentive to the children, and that both [foster] parents are active and involved in the care of the children. She also observed that R.G., Jr., was clinging to [L.S.], [and] they demonstrated a very typical parent-child relationship. Based upon the clinical interview and observations, Dr. Menta opined that the [children have a] very loving, strong, positive bond with the [foster parents]. She concluded that "[t]here is clearly a healthy bond and it would be in [R.G., Jr.'s and L.G.'s] best interest to reside with [L.S.] and [C.S.] permanently." Bonding Assessment, Agency Exhibit 1.

Father presented the testimony of Renee Pritchard, a social service aide who observed a contact visit between Father and the children. Ms. Pritchard stated that the children were very upset when they were taken from the foster parents, but they "calmed down eventually." She testified that overall, the visit went okay, and that Father interacted with the children.

Father then provided testimony. He testified that he was incarcerated at the WCP from October 16, 2017, to March of 2019. He confirmed that he had seven contact visits at the WCP, and that the first visit was held on August 21, 2018, and that the first visit was terminated after 30 minutes because [L.G.] was crying. He testified that the children like to read books, so he would let them sit on his lap, and he would flip through the books. He stated that the visits only lasted 30 minutes, so by the time the children calmed down, the visits were over. He testified that he changed dirty diapers during the contact visits.

Father stated that he wanted to have more visits, but despite the fact that he stayed free of misconducts, was an inmate worker, and was on the honor block, the WCP prevented this from happening. He stated that the WCP blamed the Agency for the fact that more contact visits didn't take place. Father testified that he had approximated 20 video visits at the WCP, and those visits lasted approximately 25 minutes each.

Father was moved to SCI Greene on March 4, 2019, and has had two contact visits with the minor children since the move. Father testified that these visits "went really well." Father testified

- 5 -

that he has sent letters, cards, drawings, and pictures to the children on a monthly basis. He stated that he would like to send such items more often but he "has a lot going on with his criminal cases."

With regard to programs attended while incarcerated, Father stated that he completed a parenting program, and an emotions management program at the WCP. Father also participated in a Jail CRS Recovery Group and received certificates for his efforts as a library worker. Father's "Certificates of Completion" were marked and admitted collectively as Father's Exhibit A. While at SCI Greene, Father submitted request slips to participate in or is enrolled in secondary schooling (business management), Pathways to Success, Reading to your Child, OSHA, Flagger's class, and Money Smart. Father's "Request Slips to SCI Greene" were marked and admitted collectively as Father's Exhibit D. Father testified that he is not eligible to participate in parenting classes until he is closer to his parole date.

Father then provided testimony about his sentence of incarceration, minimum parole date, and parole plan. Father received a sentence of incarceration imposed by the Court of Common Pleas of Westmoreland County of not less than 2½ years nor more than 5 years. Father believes that he is entitled to credit on this case back to September 18, 2018, and that he is "working on this." In any event, Father believes that he may be eligible for parole around August 1, 2020. Once he is paroled, Father plans to live with his grandparents in Armagh, Indiana County, Pennsylvania. He stated that living with his mother is also a possibility.

On cross-examination, Father acknowledged that he was living at a halfway house at the time the children were born, and that he absconded from the halfway house, which resulted in the issuance of a warrant for his arrest. Father also acknowledged that he has been charged in 18 separate criminal cases in the last 10 years, which have resulted in a decade of incarceration or parole/probation supervision. Finally, Father acknowledged that he has a 7-year old son who is being raised in another's care.

Orphans' Court Opinion, filed 10/22/19, at 1-9 (footnotes omitted and added).

At the conclusion of the hearing, the Orphans' Court requested that the parties, including Attorney Johnson on behalf of the children, submit legal

memorandums addressing whether a bond between Father and the children existed, and if not, whether such a bond was prevented to form because of the "actions of others." N.T., 7/24/19, at 105.

By Order and Opinion entered on October 22, 2019, the Orphans' Court found clear and convincing evidence to involuntarily terminate Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(8). The Orphans' Court additionally concluded that termination of Father's parental rights was in the best interest of the children pursuant to 23 Pa.C.S.A. § 2511(b).

On November 19, 2019, Father filed two separate counseled notices of appeal, each containing a single lower court docket number pertaining to each child. On that same date, Father's counsel filed a statement of intent to file an **Anders** Brief pursuant to Pa.R.A.P. 1925(c)(4).

On December 4, 2019, this Court *sua sponte* consolidated Father's appeals. On January 13, 2020, Father's counsel filed an **Anders** brief, as well as a motion to withdraw as counsel. "[T]his Court [has] extended the **Anders** principles to appeals involving the termination of parental rights." **In re X.J.**, 105 A.3d 1, 3 (Pa.Super. 2014) (citation omitted).

When faced with a purported **Anders** brief, this Court may not review the merits of any possible underlying issues without first examining counsel's request to withdraw. **Commonwealth v. Goodwin**, 928 A.2d 287, 290 (Pa.Super. 2007) (*en banc*). Prior to withdrawing as counsel on direct appeal

under **Anders**, counsel must file a brief that meets the requirements established by the Pennsylvania Supreme Court in **Santiago**, namely:

(1) provide a summary of the procedural history and facts, with citations to the record;

(2) refer to anything in the record that counsel believes arguably supports the appeal;

(3) set forth counsel's conclusion that the appeal is frivolous; and

(4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

**Santiago**, **supra**, 978 A.2d at 361.

Counsel also must provide a copy of the **Anders** brief to h[er] client. Attending the brief must be a letter that advises the client of his right to: "(1) retain new counsel to pursue the appeal; (2) proceed pro se on appeal; or (3) raise any points that the appellant deems worthy of the court[']s attention in addition to the points raised by counsel in the **Anders** brief."

**Commonwealth v. Orellana**, 86 A.3d 877, 879-80 (Pa.Super. 2014) (quotation omitted).

In the instant matter, counsel has filed a petition to withdraw in which she certifies that she has reviewed the case and determined that Father's appeal is wholly frivolous. Counsel has also filed an **Anders** brief that includes a summary of the history and facts of the case, issues raised by Father, and counsel's assessment of why those issues are frivolous with citations to relevant legal authority. Counsel has provided this Court with a copy of her letter to Father, advising him that he may obtain new counsel or raise

additional issues *pro se*.[4]  We conclude counsel has substantially complied with the requirements of **Anders** and **Santiago**.  **See Commonwealth v. Reid**, 117 A.3d 777, 781 (Pa.Super. 2015) (observing that substantial compliance with the **Anders** requirements is sufficient).  Therefore, we proceed to examine the issues counsel identified in the **Anders** brief and then conduct "a full examination of all the proceedings, to decide whether the case is wholly frivolous."  **Commonwealth v. Yorgey**, 188 A.3d 1190, 1195 (Pa.Super. 2018) (*en banc*) (quotation omitted).

On appeal, counsel has set forth the following issues in the **Anders** brief on behalf of Father:

1. Did the [Orphans'] Court commit abuse of discretion or error of law when it concluded that the Agency established grounds for termination pursuant to 23 Pa.C.S.A. § 2511(a)(8)?

2. Did the [Orphans'] Court commit abuse of discretion or error of law when it concluded that the termination of parental rights was appropriate and in the children's best interest pursuant to 23 Pa.C.S.A. § 2511(b)?

3. Did the [Orphans'] Court commit abuse of discretion or error of law when it concluded that no bond existed between Father and the minor children?

4. Did the [Orphans'] Court commit abuse of discretion or error of law when it determined that the Westmoreland County Prison and/or the Agency's interference with Father's visits were inconsequential to the Court's decision?

**Anders** Brief at 6.

We review these claims mindful of our well-settled standard of review:

_____

[4] Father has not filed an additional brief with the assistance of new counsel or *pro se*.

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the [Orphans' Court] if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the [Orphans' Court] made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The [Orphans' Court's] decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to [Orphans' Courts] that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 620 Pa. 602, 71 A.3d 251, 267 (2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. § 2101-2938, which requires a bifurcated analysis:

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [subsection] 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to [subsection] 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted).

In the case *sub judice*, the Orphans' Court terminated Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(8) and (b), which provide as follows:

**§ 2511. Grounds for involuntary termination**

- 10 -

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

***

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

***

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(8), (b) (bold in original).

We first examine Father's contention that the Orphans' Court abused its discretion in determining the Agency set forth clear and convincing evidence to support the involuntary termination of Father's parental rights under subsection 2511(a)(8).

Parental rights may be terminated pursuant to subsection 2511(a)(8) if "(1) the child has been removed from the care of the parent for at least twelve months; (2) the conditions that led to the removal or placement of the child

continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child." *In re I.J.*, 972 A.2d 5, 11 (Pa.Super. 2009).

"As this Court has repeatedly indicated, termination under subsection (a)(8) does *not* require an evaluation of [a parent's] willingness or ability to remedy the conditions that led to placement of [the] children." *Id.* (emphasis in original; citation omitted). Instead, subsection (a)(8) "requires only that the conditions continue to exist, not an evaluation of parental willingness or ability to remedy them." *Id.* (citation and quotation marks omitted).

Therefore, the relevant questions are whether the parent has remedied the conditions that led to the removal of the children and whether the children's reunification with that parent is imminent at the time of the termination hearing. *See id.*; *In re Adoption of R.J.S.*, 901 A.2d 502, 512 (Pa.Super. 2006) (concluding that termination under subsection 2511(a)(8) was appropriate where the mother was not in a position to parent her children at the time of the termination hearing). "If a parent fails to cooperate or appears incapable of benefiting from the reasonable efforts supplied over a realistic period of time, [the Agency] has fulfilled its mandate and[,] upon proof of satisfaction of the reasonable good faith effort, the termination petition may be granted." *In re A.R.*, 837 A.2d 560, 564 (Pa Super. 2003) (quotation, quotation marks, and brackets omitted).

As we have previously stated,

[w]e recognize that the application of [subsection] (a)(8) may seem harsh when the parent has begun to make progress toward

- 12 -

resolving the problems that had led to removal of [his] children. By allowing for termination when the conditions that led to removal continue to exist after a year, the statute implicitly recognizes that a child's life cannot be held in abeyance while the parent is unable to perform the actions necessary to assume parenting responsibilities. This Court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future. Indeed, we work under statutory and case law that contemplates only a short period of time, to wit eighteen months, in which to *complete* the process of either reunification or adoption for a child who has been placed in foster care.

*In re I.J.*, 972 A.2d at 11 (emphasis in original) (citation omitted).

In addition, we recognize our Supreme Court has held the following:

[I]ncarceration is a factor, and indeed can be a determinative factor, in a court's conclusion that grounds for termination exist under § 2511(a)(2)[5] where the repeated and continued incapacity of a parent due to incarceration has caused the child to be without essential parental care, control or subsistence and that the causes of the incapacity cannot or will not be remedied.

*In re Adoption of S.P.*, 616 Pa. 309, 47 A.3d 817, 828 (2012) (footnote added). The rationale of *In re Adoption of S.P.* is equally applicable in this case under subsection 2511(a)(8).

_____

[5] Subsection 2511(a)(2) permits the involuntary termination of parental rights where:

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S.A. § 2511(a)(2).

In the case *sub judice*, in terminating Father's parental rights under subsection 2511(a)(8), the Orphans' Court relevantly indicated the following:

> Father's extended and continuous unavailability due to his incarceration is at the core of the [Orphans'] Court's decision in this matter.
>
> \*\*\*
>
> The [children were] born [i]n July [of] 2017. An Adjudication and Disposition Hearing was held before [the Orphans'] Court on September 21, 2017; [the children were] adjudicated as…dependent [children] and [were] ordered to remain in the…foster home, where [they have] been placed as a result of the Voluntary Placement Agreement signed on August 25, 2017. Further, it is undisputed that Father has been continuously incarcerated from October 16, 2017, until the present time. It also is clear that Father's involvement with [the children] from [their] birth until [Father's] incarceration (approximately 83 days) was limited because of Father's residence at a halfway house and [his] avoidance of apprehension. Finally, it is clear Father's incarceration will continue, at least according to Father, until at least August 1, 2020.[6]
>
> Given these facts, the Agency has proven by clear and convincing evidence that the minor [children were] removed from Father's care by [the Orphans'] Court, 12 months or more have elapsed (more than 22 months [had] elapsed as of the time of the hearing), and the conditions which led to the removal and placement continue to exist (Father's absence due to his criminal [activities] and now continued incarceration). Therefore, the only issue remaining pursuant to 23 Pa.C.S.A. [§] 2511(a)(8) is whether termination would best serve the needs and welfare of the [children].
>
> The Court looks to the expert testimony of Dr. Carolyn Menta. Dr. Menta conducted a clinical interview of the foster parents and observed the minor [children] with the foster parents. Additionally, Dr. Menta was aware of Father's incarceration in a state prison facility. Based on her interviews and observations, Dr. Menta concluded that "[t]here is clearly a healthy bond and it

---

[6] As the Orphans' Court noted, whether Father will be paroled and, if so, where he will live, is "extremely speculative" at this time. Orphans' Court Opinion, filed 10/22/19, at 11 n.3.

would be in [the children's] best interest to reside with [L.S.] and [C.S.] permanently." Bonding Assessment, Agency Exhibit 1. The [Orphans'] Court finds this uncontradicted expert testimony to be reliable, and therefore, the Agency has proven by clear and convincing evidence that termination best serves the needs and welfare of [the children].

Orphans' Court Opinion, filed 10/22/19, at 10-12 (footnote omitted and footnote added).

We discern no abuse of discretion in the Orphans' Court's determination that termination of Father's parental rights pursuant to subsection 2511(a)(8) would best serve the needs and welfare of the children. **See In re Adoption of S.P.**, **supra**, 47 A.3d at 826–27. We defer to the Orphans' Court's credibility determinations. **See id.** The totality of the circumstances warrants termination pursuant to subsection 2511(a)(8).

Father's remaining claims relate to the Orphans' Court's determination that termination of Father's parental rights would best serve the children's best interests under subsection 2511(b). In this regard, Father contends the evidence does not support termination under subsection 2511(b), the Orphans' Court erred in finding no bond existed between Father and the children, and the Orphans' Court erred in its consideration of the WCP's and/or the Agency's interference with Father's visits with the children.

The requisite analysis is as follows:

[Subsection] 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, [subsection] 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption

- 15 -

Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

> [I]n addition to a bond examination, the [Orphans' Court] can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court [has] stated that the [Orphans' Court] should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa.Super. 2015) (quotation, quotation marks, and citations omitted).

The Orphans' Court found that termination of Father's parental rights best met the children's needs and welfare under subsection 2511(b) and reasoned as follows:

> Once again, the Court turns to the uncontradicted expert testimony of Dr. Carolyn Menta. Dr. Menta unequivocally concluded that the minor [children] should "continue to reside with [L.S.] and [C.S.] permanently." The [Orphans'] Court notes that Dr. Menta did not observe the minor [children] with Father, and, therefore, she was unable to "comment as to the nature or quality of any bond [the children] might have with him." Bonding Assessment, Agency Exhibit 1. However, [t]he [Orphans'] Court finds that given the young age of the minor [children], and the fact that [they have] been in the care of the foster parents for approximately 23 out of 24 months of [their] young [lives], it is inconceivable to [the Orphans'] Court that the [children] would feel any emotional bond to Father. Further, the testimony demonstrates that the minor [children are] bonded to foster parents, and, therefore, terminating the parental rights of Father will best serve the "developmental, physical, and emotional needs and welfare" of the minor [children]. 23 Pa.C.S.A. [§] 2511(b).

The [Orphans'] Court acknowledges Father's argument that despite the fact that he was incarcerated at the WCP for approximately 17 months, the bureaucracy of the WCP, and possibly the Agency, resulted in a total of 7 contact visits with the minor [children]. While the [Orphans'] Court agrees that more contact visits should have taken place, the Court finds that this fact does not impact the Court's decision in this matter. This is not a situation where the [children were] previously bonded to Father and contact visits were critical in maintaining the existing bond. To the contrary, no bond existed between Father and the infant [children], and it is beyond belief that Father and the minor [children] could have developed a parent-child bond during one-hour jail visits.

Orphans' Court Opinion, filed 10/22/19, at 12-14.

The record supports the Orphans' Court's decision to involuntarily terminate Father's parental rights pursuant to subsection 2511(b). The record reveals the children have lived with their foster parents for most of their lives, and they are doing well in the foster parents' home. Dr. Menta specifically concluded it is in the children's best interests to remain with the foster parents.

The credited testimony supports the Orphans' Court's determination that it would best serve the needs and welfare of the children to involuntarily terminate Father's parental rights pursuant to subsection 2511(b). Preserving Father's parental rights would serve only to deny the children the permanence and stability to which they are entitled. *See In re Adoption of C.D.R.*, 111 A.3d at 1220 ("Clearly, it would not be in [the children's] best interest for [their] life to remain on hold indefinitely in hopes that [Father] will one day be able to act as [their] parent."). Accordingly, the Orphans' Court did not

err in terminating Father's parental rights to the children pursuant to subsection 2511(b).[7]

After examining the issues contained in the **Anders** brief, we concur with counsel's assessment that the appeal is wholly frivolous. "Furthermore, after conducting a full examination of all the proceedings as required pursuant to **Anders**, we discern no non-frivolous issues to be raised on appeal." **Yorgey**, 188 A.3d at 1195. Thus, we grant counsel's petition to withdraw and affirm the Orphans' Court's Orders, which involuntarily terminated Father's parental rights to the children.

Affirmed. Motion to withdraw granted.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/3/2020

---

[7] We specifically find no merit to Father's contentions that the Orphans' Court erred in finding no bond existed between Father and the children and/or that the Orphans' Court did not properly consider the WCP's/Agency's interference with Father's visits. As indicated *supra*, the Orphans' Court considered the testimony offered as to these issues and properly made the relevant credibility determinations. **See** Orphans' Court Opinion, filed 10/22/19, at 12-14; **In re Adoption of S.P.**, **supra**.